# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

GORDON JEFFERSON,         )
          )
        Plaintiff,       )
          )
       v.           )      Case No. 4:11-CV-921 NAB
          )
MICHAEL J. ASTRUE,       )
Commissioner of Security,    )
          )
        Defendant.     )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Gordon Jefferson's ("Jefferson") application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C. § 1381 *et seq.* Jefferson alleges disability due to degenerative disc disease of the lumbar spine. (Tr. 143.) Jefferson filed a Brief in Support of Plaintiff's Complaint. [Doc. 16]. The Commissioner filed a Brief in Support of the Answer. [Doc. 19]. Jefferson then filed a Reply Brief in Support of the Complaint. [Doc. 20]. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Doc. 11].

## I.      PROCEDURAL HISTORY

On April 4, 2007, Jefferson applied for a Period of Disability and Supplemental Security Income, alleging an onset date of January 12, 2006. (Tr. 114, 118.) On September 20, 2007, the Social Security Administration denied Jefferson's claims. (Tr. 42-45.) Jefferson filed a request for reconsideration, which was denied on March 19, 2008. (Tr. 46, 54-57.) Jefferson then requested a hearing in front of an administrative law judge ("ALJ") and a hearing was held on September 24, 2009. (Tr. 24-39, 58-59.) The ALJ issued a written opinion on March 18, 2010,

affirming the denial of benefits.  (Tr. 9-23.)  On March 18, 2011, the Appeals Council denied Jefferson's request for review.  (Tr. 1-6.)  The ALJ's decision thus stands as the Commissioner's final decision.  Jefferson then filed this appeal on May 20, 2011.  (Doc. 1.)

## II.    ADMINISTRATIVE RECORD

### A.    Disability Application and Earnings Record

Jefferson completed a Disability Report ("Report") on April 4, 2007.  (Tr. 134.)  In the Report, Jefferson indicated that he was forty-three years old and he had not worked since January 12, 2006.  (Tr. 131, 143.)  Jefferson indicated that he obtained a high school diploma in 1981 and received special training regarding painting, automotive engine repair, and building maintenance from Job Corps in 1985.  (Tr. 150.)  Jefferson reported that he had worked full-time as a general laborer for various businesses since 1985.  (Tr. 135, 144.)  At his last job as a general laborer, Jefferson indicated that he laid asphalt and concrete and that the heaviest weight that he lifted was 100 pounds and he frequently lifted 50 pounds or more.  (Tr. 156.)  Jefferson also reported that at his last job he supervised three other employees.  (Tr. 156.)  Jefferson indicated that his previous jobs as a general laborer also included making plastersol inks; driving a bus for disabled people; blowing and power sweeping parking lots and decks; installing sump pumps and waterproofing; and operating power washing equipment, street sweepers, and snow plows.  (Tr. 157-161.)  In his previous jobs, Jefferson reported that he frequently lifted between 25 and 50 pounds and that the heaviest weight he lifted was between 50 and 100 pounds.  (Tr. 157-161.)  The earnings record from the Social Security Administration indicates that Jefferson has earnings from 1979 to 2006.  (Tr. 126.)

**B.     Testimony Before the ALJ**

On September 24, 2009, the ALJ held a hearing and heard testimony from Jefferson and vocational expert ("VE") Ms. Deborah Bunn-Durham.[1]  (Tr. 24-39.)  Jefferson was represented by counsel.  (Tr. 26.)

**1.     Jefferson's Testimony**

Jefferson testified that he had been using a cane since late 2007.  (Tr. 27.)  Jefferson stated that his doctor prescribed the cane.  (Tr. 27-28.)  He claimed that the cane assisted him in walking by taking pressure off his legs.  (Tr. 31.)

Jefferson testified that he had a stimulator for pain and took medication to help him sleep.  (Tr. 28.)  Jefferson also stated that his pain had decreased by half since the stimulator was put in place.  (Tr. 28.)  Jefferson testified he rated his pain as between 5 and 7 on a ten point scale with ten being the worst.  (Tr. 28-29.)  Jefferson stated he was not going to have surgery regarding his disks because it, "would put [him] in a chair permanent[ly]."  (Tr. 32.)

Jefferson stated that he could only walk four minutes at most before he needed to take a break, because he will get a pain in his back and his legs would go numb.  (Tr. 29.)  Jefferson also stated that he experienced pain when standing straight up.  (Tr. 31.) Jefferson also testified that he needed to recline when seated because sitting up straight caused "everything [to] go numb all the way down to the top of [his] feet."  (Tr. 29-30.)  Jefferson stated that his disc problem caused the pain that required him to sit in a reclining position.  (Tr. 30.)

Jefferson testified that standing up straight caused pain and he needed to lean forward while standing to relieve pressure to walk.  (Tr. 31.)  Jefferson also testified that, if he were to

---

[1] The administrative hearing transcript refers to the VE as Ms. Vondurum without a first name.  Plaintiff's Brief indicates that the VE's full name is Deborah Bunn-Durham.  (Pl.'s Br. 13, n. 3.)

stand at a countertop or in front of a sink washing dishes, he would be able to stand two minutes before pain would compel him to sit, due to pain in his back and legs.  (Tr. 31.)  Jefferson stated that he felt pain in the front and side of his legs from his waist down to the top of his feet.  (Tr. 31.)

Jefferson testified that his ability to do functional activities was impaired.  (Tr. 32.) Jefferson stated he could not perform activities around the house such as vacuuming and sweeping because constant movement increased his pain.  (Tr. 32.)  Jefferson testified that he could pick up five pound objects and carry more than five pounds.  (Tr. 32-33.)  Jefferson claimed that he needed assistance in putting on his shoes because it hurt when he bent over.  (Tr. 33.)  He also stated that he did not take baths and used a shower chair while showering.  (Tr. 33.)

Jefferson testified that he passed his time during the day watching TV.  (Tr. 33)  He testified that he sat on his couch propped up at a comfortable angle while watching TV.  (Tr. 34.) Jefferson stated that he left his stimulator on constantly and needed to charge it once a week. (Tr. 34.)  Jefferson testified that he slept poorly without his medication and took occasional naps during the day.  (Tr. 34.)  Finally, Jefferson testified that he drove to go to the doctor.  (Tr. 34-35.)

### 2. Vocational Expert's Testimony

The ALJ posed the following hypothetical to the VE:

> I have a hypothetical involving a younger person with high school education and no transferrable skills, who can perform light work.  The following are occasional:  Climbing stairs and /or ramps, kneeling, crouching, balancing, stooping, can never crawl , can never climb ladders or scaffolds, must avoid all exposure to unprotected heights and cannot work on uneven terrain or floors as it requires a cane to assist with ambulation.  Question is whether there will be any jobs in the national or regional economy that such a person could perform, and if so, in what numbers?

(Tr. 35.)  The VE testified that there the jobs of ticket seller, cashier, and gate guard were available jobs for the individual described in the hypothetical.  (Tr. 35.)  The VE testified that those jobs were sedentary and unskilled.  (Tr. 35.)  Next, Jefferson's counsel inquired whether the hypothetical individual would be able to perform those jobs with the additional limitation that the individual would be required to sit/stand at will.  (Tr. 36.)  The VE responded that the individual would still be able to perform the cashier and ticket seller jobs.  (Tr. 36.)  Then, Jefferson's counsel asked if the hypothetical individual would be able to do the remaining jobs if the hypothetical individual had to miss up to three days or more of work each month.  (Tr. 36-37.)  The VE testified that the absences would prevent the hypothetical individual from being able sustain work if the absences were consistent over time.  (Tr. 37.)  Jefferson's counsel next asked would a requirement that the hypothetical individual must recline back while working be a reasonable accommodation in the workplace.  (Tr. 37.)  The VE responded that if the hypothetical individual has to recline so much while he worked that he couldn't be at a work station, but for brief periods of time, that would preclude being able to work.  (Tr. 37.)  The VE stated that it would not be an accommodation, otherwise.  (Tr. 38.)  Jefferson's counsel then posed a final limitation, asking the type of impact upon the hypothetical individual's work activity if the individual had to be reclined more than 60 percent of the time.  (Tr. 38.)  The VE responded that that final limitation would preclude work.  (Tr. 38.)

## C.    Medical Records

On April 13, 2000, Jefferson visited the Forest Park Hospital emergency room after a rear end motor vehicle accident the previous day.  (Tr. 208.)  Jefferson reported that he had whiplash, a headache, and lower back pain radiating to his feet.  (Tr. 208.)  Jefferson also reported a history of spinal or cervical problems due to a pulled muscle in 1985.  (Tr. 208.)  The record notes that

Jefferson was able to ambulate and bear weight. (Tr. 208.) Jefferson was diagnosed with lumbar strain. (Tr. 214.) Upon discharge, Jefferson was instructed to stay off work until April 17th, apply warm moist heat to the injured area, and refrain from operating machinery if the medication Norlex became sedating. (Tr. 209, 212.)

Jefferson attended a physical therapy session on April 19, 2000. (Tr. 219.) Jefferson reported that his pain was much worse and nothing relieved his pain, even temporarily. (Tr. 219.) Jefferson attended a second physical therapy session on May 4, 2000. (Tr. 220.) Jefferson reported that he tolerated walking, but standing increased his pain. (Tr. 220.) It was noted that Jefferson progressed well. (Tr. 220.)

On May 30, 2000, Jefferson returned to the emergency room at Forest Park Hospital complaining of pain to the lumbar area and pain down his right lateral thigh. (Tr. 215.) Jefferson reported that his pain was aggravated after lifting something at work. (Tr. 215.) He denied feeling numbness or weakness. (Tr. 215.) The record notes that he ambulated through the emergency room with difficulty. (Tr. 215.) An X-ray of his lumbar spine was unremarkable. (Tr. 221.) Jefferson's discharge instructions provided that he should continue on Motrin and Flexeril, raise his feet 48 degrees, rest, and return if problems arise. (Tr. 214.)

On August 21, 2001, Jefferson visited the emergency room at St. Mary's Hospital. (Tr. 318-326.) Dr. Rekha Lakshmanan diagnosed Jefferson with lower back pain. (Tr. 320.) Upon discharge Dr. Lakshmanan instructed Jefferson to follow up with his physician, Dr. Darren Pearson at the first available appointment. (Tr. 320.) Jefferson received further instructions not to drive for seven hours due to medication and he received prescriptions for Vicodin and Lortab. (Tr. 320.) Dr. Lakshmanan determined that Jefferson could return to work on August 23, 2001 with the limitation of no heavy lifting. (Tr. 322.)

On September 19, 2001, an MRI of Jefferson's lumbar spine showed degenerative disc disease at L4-L5.  (Tr. 293.)

On October 1, 2001, Jefferson visited the emergency room at St. Mary's Hospital complaining of severe back pain radiating to his right leg.  (Tr. 313.)  Jefferson reported that he could not stand very long.  (Tr. 313.)  Dr. Elma Cara diagnosed Jefferson with chronic back pain.  (Tr. 314.)  Jefferson received prescriptions for Flexeril and Toradol.  (Tr. 314.)

Jefferson received epidural steroid injections in his lumbar region on October 19, 2001 and November 5, 2001.  (Tr. 298, 301.)  On December 10, 2001, Jefferson visited the pain clinic at St. Mary's Hospital to discuss instructions regarding his upcoming discography (Tr. 291-92.)

On December 27, 2001, Dr. Richard Gahn performed a lumbar discography and direct fluorospcopy on Jefferson.  (Tr. 287.)  Dr. Gahn indicated that the purpose of the procedure was to determine the etiology of Jefferson's low back pain.  (Tr. 287.)

On January 11, 2002, Dr. Gahn performed a percutaneous decompression surgical procedure and direct fluoroscopy on Jefferson.  (Tr. 283-284.)  The purpose of the procedure was to decrease the pressure in his L3-4 and L4-5 discs to alleviate pain.  (Tr. 283.)  The surgery was an outpatient surgery and Jefferson was discharged home with prescriptions of Vicodin and Celebrex.  (Tr. 284.)

On September 26, 2002, Jefferson visited the emergency room at St. Mary's Hospital complaining of right shoulder pain that began five days earlier while playing frisbee.  (Tr. 274.)  Dr. Annu Terkonda diagnosed Jefferson with right shoulder strain.  (Tr. 274.)  Upon discharge, Jefferson received prescriptions for Motrin and Roxicet and a shoulder sling.  (Tr. 274.)  He received instructions to say off work for 3 days and follow-up with his primary physician.  (Tr. 274, 278.)  He was not given any work limitations.  (Tr. 278.)

On January 12, 2006, Jefferson visited certified Physician Assistant Rich Schick complaining of back pain. (Tr. 373.) Mr. Schick prescribed Feldene and Flexeril and recommended that Jefferson be evaluated for orthopedic surgery at the first available appointment. (Tr. 374.)

On February 1, 2006, Jefferson visited Dr. John Porter for a consultation, upon a request from Dr. Anthony Cabot. (Tr. 246-250.) Jefferson reported six years of back and radiating right leg pain. (Tr. 246.) Jefferson also reported that during the previous three months, he experienced a dramatic increase in lower back and leg pain, which is tingling and burning in nature. (Tr. 246.) Jefferson also complained that he is not comfortable in any position whether sitting, standing, walking, or lying down. (Tr. 246.) In his physical examination of Jefferson's back, Dr. Porter noted that Jefferson had very limited flexion, extension, rotation, and lateral flexion due to the pain. (Tr. 248.) Dr. Porter also noted tenderness at both the L4-5 and L5-S1 interspaces. (Tr. 248.) Dr. Porter determined that Jefferson had axial and radicular back pain, which was discogenic in nature and that the symptoms were neuropathic. (Tr. 249.) Jefferson indicated to Dr. Porter that he did not want to continue injections or pain management. (Tr. 250.) Therefore, Dr. Porter referred Jefferson to another doctor for surgical consultation and treatment. (Tr. 250.)

On February 13, 2006, Jefferson visited neurosurgeon, Dr. Tariq Javed. (Tr. 223-226.) Dr. Porter referred Jefferson to Dr. Javed for evaluation of Jefferson's lumbar disc disease. (Tr. 223.) Dr. Javed noted that Jefferson's motor strength was 5/5 and equal and that his gait and station were within normal limits. (Tr. 225.) Dr. Javed also noted that an MRI scan of Jefferson's lumbar spine showed the following: (1) degeneration involving the L4-5 and L5-S1 discs, (2) no evidence of lateral disc herniation at the L3-4 level accounting for the L4 radicular

symptoms, (3) mild bulge of the disc at L4-5 secondary to degeneration and a smaller disc protrusion at L5-S1, and (4) epidural scar tissue behind the thecal sac of L4-5. (Tr. 225.) Dr. Javed diagnosed Jefferson with lumbar degenerative disc disease and status post nucleoplasty possibly at L4-5. (Tr. 226.) Dr. Javed determined that Jefferson's pain was not in the distribution of the degenerative disc disease found on the MRI scan and he cannot find a far lateral disc at the L4-5 level which would cause his L4 symptoms. (Tr. 226.) He also opined that Jefferson had "a considerable amount of over-magnification particularly with examining him neurologically." (Tr. 226.) Dr. Javed also determined that Jefferson was not the best candidate for surgery. (Tr. 226.) Dr. Javed recommended that Jefferson follow conservative treatment with physical therapy and injections to help with his back pain and that Jefferson seek a second opinion. (Tr. 226.) Dr. Javed transcribed a letter to Dr. Porter that contained the above information. (Tr. 231.)

On January 2, 2007 received treatment from Dr. James Harvey regarding his back pain. (Tr. 375-76.) Dr. Harvey determined that Jefferson had lumbosacral radiculopathy and recommended an evaluation by a neurosurgeon. (Tr. 375.)

On January 6, 2007[2], Jefferson met with Dr. Vidyadhar Chitale for an initial neurosurgical consultation. (Tr. 345.) Dr. Chitale noted that a physical examination revealed that Jefferson demonstrated an antalgic gait and that his lumbar flexibility was reduced secondary to the back pain. (Tr. 345.) Dr. Chitale also noted that Jefferson had difficulty raising his own weight on the right foot and showed gastrocnemius weakness and numbness in the outer two toes. (Tr. 345.) Dr. Chitale ordered an MRI of Jefferson's lumbar spine for further evaluation. (Tr. 345.)

---

[2]The Court notes that the document cited contains a 2006 date. Based on the evidence in the record from Dr. Chitale's office, the Court believes that this visit occurred in 2007 and the notation in the record with the 2006 date is a typographical error.

Jefferson had an MRI of his lumbar spine without contrast on January 18, 2007. (Tr. 348.) The MRI results indicate normal alignment of the lumbar vertebrae and evidence of mild chronic degenerative disc disease at the L4-5 and L5-S1 levels where the discs appeared desiccated. (Tr. 348.) The results also indicated no evidence of disc herniation or significant spinal canal stenosis. (Tr. 348.)

On January 19, 2007, Jefferson visited the emergency room at Kennestone hospital with complaints of back pain from a fall. (Tr. 394.) Dr. Lucas Lathrop diagnosed Jefferson with back pain and chronic radiopathy. (Tr. 395.) Jefferson received a prescription for Percocet and was told to follow up as soon as possible with Dr. Javed.

Dr. Chitale and Jefferson met again on January 24, 2007 for a follow-up neurosurgical consultation. (Tr. 344.) Dr. Chitale noted that the MRI of the lumbar spine demonstrated significant disc degeneration at multiple levels at L2-3, L3-4, L4-5, and L5-S1. (Tr. 344.) Dr. Chitale also noted that there was no free disc fragment herniation at any level and that the L5-S1 shows an annular bulge with disc desiccation. (Tr. 344.) Dr. Chitale indicated that it would not be conceivable that Jefferson would improve with surgical treatment directed toward multiple lumbar disc degenerative disease. (Tr. 344.) Therefore, Dr. Chitale referred Jefferson to pain management services and indicated that he hoped Jefferson would go through a dorsal column stimulation trial, with the possibility for permanent implantation.[3] (Tr. 344.)

On February 1, 2007, Jefferson visited Dr. Porter complaining of back and bilateral leg pain. (Tr. 366.) Jefferson reported that his pain was "throbbing, burning, electric pain." (Tr. 366.) Jefferson also reported that prolonged sitting makes both of his legs numb and he has difficulty sleeping due to pain. (Tr. 366.) Dr. Porter determined that Jefferson had multilevel

---

[3] A dorsal column stimulator applies electrodes to the dorsal columns of the spinal cord. Stedman's Medical Dictionary 1700 (27th ed. 2000).

degenerative disc disease with chronic axial and lumbar radicular pattern pain, no surgically repairable lesions, and that all more conservative treatments failed.  (Tr. 366.)  Dr. Porter also determined that Jefferson was a good candidate for a spinal cord stimulation test and Jefferson agreed to undergo the procedure.  (Tr. 366.)

On February 13, 2007, Jefferson visited Dr. David Gower for a new patient consultation. (Tr. 240-243.)  Jefferson reported that he had back pain that radiated to his right leg.  (Tr. 240.) Jefferson also reported that the epidural injections, physical therapy and nucleoplasty were either not helpful or did not provide long lasting relief.  (Tr. 240.)   After completing a physical evaluation, Dr. Gower noted that Jefferson had "marked difficulty straightening up" and could not stand straight up.  (Tr. 242.)  Dr. Gower also noted that Jefferson sat with his back bent away from his right side.  (Tr. 242.)  Dr. Gower indicated that an examination of Jefferson's back revealed "a very tight back with poor range of motion" and that Jefferson could only bend forward to about 60 degrees.  (Tr. 242.)  Dr. Gower determined that Jefferson had leg and back pain with an unclear etiology.  (Tr. 243.)  Dr. Gower ordered a myelogram[4] and a CT scan.  (Tr. 243.)

The myelogram and CT scan were performed on February 19, 2007.  (Tr. 236-239.)  On March 6, 2007, Jefferson and Dr. Gower met regarding the test results.  (Tr. 233.)  Jefferson reported that his pain was an 8 or 9 with bilateral pain in both legs.  (Tr. 233.)  Dr. Gower completed a bone scan of Jefferson's back and determined there was no disc space or facet joint that would result in the pain described by Jefferson.  (Tr. 233.)  Dr. Gower noted that the myelogram and CT scan failed to demonstrate any significant nerve root compression.  (Tr. 233.) Dr. Gower opined that Jefferson did not need surgical intervention.  (Tr. 233.)  Jefferson reported

---

[4] A myelogram is a radiographic contrast study of the spinal subarachnoid space and its contents.  Stedman's Medical Dictionary 1171 (27th ed. 2000).

to Dr. Gower that he would return to the pain clinic doctor and see if there was anything else that could be done. (Tr. 233.)

Jefferson received treatment regarding his back and leg pain at The Physicians' Pain and Rehabilitation Specialists of Georgia in March, April, June, and August of 2007. (Tr. 366-372.) During his March 15, 2007 visit, Jefferson indicated a high level of pain that was close to being the worst pain. (Tr. 372.) At the April 10, 2007 visit, Jefferson reported that he was doing well and was 50 percent better. (Tr. 368.) Jefferson reported that his pain level was 3 out 10 with 10 being the worst and that he moved around better at his June 14, 2007 visit. (Tr. 371.) During the August 7, 2007 visit, Jefferson rated his pain level as 5 out of 10 on the pain scale with 10 being the worst and reported no significant changes in his general health since his last visit. (Tr. 370.) Jefferson indicated, however, that his pain affects his activity level at a rating of 9 out of 10 with 10 representing that he "can't do anything at all." (Tr. 370.)

On April 18, 2007, Jefferson met with Dr. Chitale for a follow-up neurosurgical consultation. (Tr. 343.) Dr. Chitale noted that Jefferson had done extremely well with his spinal cord stimulation trial with Dr. Porter and desired to have a permanent implantation. (Tr. 343.) On April 27, 2007, Jefferson had surgery to permanently insert a paddle-lead Tripole dorsal column stimulator. (Tr. 400-401.) Dr. Chitale noted that Jefferson did well postoperatively and he instructed Jefferson to avoid all strenuous activities. (Tr. 398.)

Jefferson visited Dr. Chitale for a follow-up visit on May 16, 2007. Dr. Chitale indicated that during the visit, Jefferson's dorsal column stimulator system was reprogrammed and three programs were given to Jefferson. (Tr. 342.) Jefferson reported that his pain control was satisfactory and adequate. (Tr. 342.)

On July 11, 2007, Jefferson visited Dr. Chitale for a follow-up visit. (Tr. 341.) Jefferson reported that he was very pleased with the outcome of the surgery. (Tr. 341.) Dr. Chitale noted that he had completed Jefferson's disability forms for him and that Jefferson would not be able to return to work in any type of gainful employment secondary to his neurological condition. (Tr. 341.)

On August 13, 2007, Jefferson visited Dr. Chitale for a follow-up visit. (Tr. 340.0 Jefferson indicated that the dorsal column stimulator placement "has done wonders for him." (Tr. 340.) Jefferson reported that he used the stimulator 'the whole day" and does not require any pain medication. (Tr. 340.) Jefferson also indicated that he took one pill at night. (Tr. 340.) Dr. Chitale noted that neurologically, Jefferson did not demonstrate any motor weakness, but still used a cane for support. (Tr. 340.) Dr. Chitale also noted that Jefferson "is not a candidate for any job at this point secondary to his chronic disabling pain even though it seems to be helped with the stimulator. (Tr. 340.) Dr. Chitale advised Jefferson to use the stimulator at nighttime and continue to decrease the pain medication usage completely. (Tr. 340.) Dr. Chitale also indicated that going forward he would only see Jefferson on an as needed basis. (Tr. 340.)

On September 17, 2007, Dr. Margaret Wilson completed a Physical Residual Functional Capacity Assessment regarding Jefferson as part of the initial determination of his claim of disability to the Social Security Administration. (Tr. 330-337.) Dr. Wilson indicated that Jefferson was diagnosed with lumbar degenerative disc disease. (Tr. 330.) Based on her review of the medical evidence of record, Dr. Wilson determined that Jefferson could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand and/or walk with normal breaks for six hours in an eight hour workday; sit with normal breaks for six hours of an eight hour workday and push or pull without limitation. (Tr. 331.) Dr. Wilson also determined that Jefferson could

occasionally climb ramps or stairs, stoop, and crouch; frequently balance, kneel, and crawl; and never climb a ladder, rope, or scaffolds.  (Tr. 332.)  In the Assessment, Dr. Wilson indicated that Jefferson did not have any manipulative, visual, communicative, or environmental limitations.  (Tr. 333-334.)  Finally, Dr. Wilson opined that Jefferson was partially credible and all work would not be precluded.  (Tr. 335.)

On December 3, 2007, Jefferson visited Dr. Chitale regarding difficulty walking long distances and wanted assistance getting a Hoveround.  (Tr. 339.)  Jefferson reported that he was doing well with the stimulation and getting relief from it.  (Tr. 339.)  Dr. Chitale indicated that if help for the Hoveround was available, then Jefferson would benefit from it.  (Tr. 339.)

On March 18, 2008, Dr. Howard Collier, completed a Physical Residual Functional Capacity Assessment of Jefferson.  (Tr. 380-387.)  Dr. Collier noted that Jefferson had a primary diagnosis of degenerative disc disease at L4-5 and S1 and disc bulge along with secondary diagnoses of nucleoplasty L4-5, and dorsal column stimulator.  (Tr. 380.)  Dr. Collier determined that Jefferson could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks 6 hours in an 8 hour workday; sit with normal breaks for six hours in an eight hour workday; and push or pull without limitation except those shown for weight.  (Tr. 381.)  Dr. Collier also determined that Jefferson could frequently climb ramps or stairs, kneel, crouch, and crawl; occasionally balance or stoop; and never climb ladders, ropes, or scaffolds. (Tr. 382.)  Dr. Collier indicated that Jefferson did not have manipulative, visual, communicative, or environmental limitations.  (Tr. 383-384.)  Dr. Collier noted there was symptom magnification present and Jefferson was doing well with his dorsal column stimulator.  (Tr. 382.)  Dr. Collier opined that Jefferson was partially credible and his allegations were not supported by the medical

evidence record. (Tr. 385.) Dr. Collier acknowledged that the medical record shows disagreement with his findings. (Tr. 386.)

On July 11, 2008, Jefferson went to the Emergency room at Kennestone Hospital. (Tr. 406-412.) Jefferson reported that his dog pulled him down to the floor and reinjured his back. (Tr. 406.) Jefferson received prescriptions for Flexeril, Ibuprofen, and Percocet. (Tr. 410.) A x-ray of Jefferson's lumbar spine revealed degenerative disc disease at L4-5 and L5-S1, without any acute fractures or dislocations. (Tr. 413.)

On November 17, 2008, Jefferson visited the Physicians' Pain Rehabilitation Specialists of Georgia to complete a research study visit. During the visit, Jefferson indicated that his pain level was a six and that his stimulator was working well and he could not do without the stimulator. (Tr. 421.)

On November 2, 2009[5], Jefferson visited Dr. Chitale because suddenly, two weeks prior, he began experiencing low back pain and bilateral leg pain in his hamstrings, and had difficulty bending forward and standing on his toes. (Tr. 436.) Jefferson reported that the symptoms scared him and he wanted them checked out, because there was no precipitating event. (Tr. 436.) Dr. Chitale indicated that a physical examination of Jefferson's lumbar spine showed a normal alignment, positive tenderness and pain to palpation; moderate muscle spasms on both sides,

---

[5] This medical record was submitted to the ALJ after the hearing, but prior to the ALJ's decision. The ALJ did not mention this medical record in his opinion. Jefferson submitted the report to the Appeals Council. In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999)). "In such a situation, "[a] court's role is to determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" *Id.* (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)). "In practice, this requires [a] court to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Id.* (citing *Riley*, 18 F.3d at 622). Thus, the appropriate inquiry is not whether the Appeals Council erred, but whether the record as a whole supports the decision made by the ALJ. *Perks v. Astrue*, No. 11-3041, 2012 WL 3168495, at *5 (8th Cir. Aug. 7, 2012) (citing *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).

decreased and painful range of motion, and positive lumbar spine root provocation. (Tr. 438.) Dr. Chitale diagnosed Jefferson with idiopathic low back pain, lumbar degenerative disc disease, lumbar radiculitis, lumbar herniated nucleas pulposus, and lumbar spinal stenosis. (Tr. 438.) Dr. Chitale opined that Jefferson could occasionally lift or carry up to ten pounds, but never lift or carry over ten pounds. (Tr. 439.) Further, Dr. Chitale recommended that Jefferson permanently refrain from working and opined that Jefferson was totally disabled from gainful employment.

### III. ALJ DECISION

The ALJ first found that Jefferson met the insured status requirements of the Social Security Act through December 31, 2010. (Tr. 14.) At step one, the ALJ found that Jefferson had not engaged in substantial gainful activity since January 12, 2006. (Tr. 14.) At step two, the ALJ determined that Jefferson suffered from the severe impairment of degenerative disc disease of the lumbar spine. (Tr. 14.) At step three, the ALJ concluded that Jefferson's impairment neither met nor medically equaled a listed impairment in 20 CFR §§ 404.1520(d), 404.125, 404.1526, 416.920(d), 416.925, and 416.926. (Tr. 14.) At step four, the ALJ found that Jefferson had the RFC to perform light work with the following limitations: (1) no more than occasional climbing of stairs or ramps, kneeling, crouching, balancing or stooping; (2) no crawling or climbing ladders and scaffolds; and (3) avoidance of all exposure to unprotected heights and work on uneven terrain or floors because he required a cane for ambulation. (Tr. 15.) Because of these limitations, the ALJ found that Jefferson could not perform his past relevant work as a general laborer. (Tr. 18.) Nonetheless, considering his age, education, work experience, and RFC, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Jefferson could still perform with his limitations. (Tr. 18-19.)

Consequently, the ALJ found Jefferson was not disabled within the meaning of the Social Security Act.  (Tr. 19.)

## IV.    LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ."  *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[6]  20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC").  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  *Id.*; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  *Id. See also* 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

---

[6]"Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity*,* and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.* *See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*,

363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987).

The factual findings of the ALJ are conclusive if supported by substantial evidence. See 42

U.S.C. § 405(g). The district court must simply determine whether the quantity and quality of

evidence is enough so that a reasonable mind might find it adequate to support the ALJ's

conclusion. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228

F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial

evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v.

Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989). Additionally, an ALJ's decision must comply

"with the relevant legal requirements." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

## V. DISCUSSION

Jefferson alleges three points of error. First, he asserts that the ALJ's decision is not

supported by substantial evidence because the ALJ failed to consider Plaintiff's steady work

record when determining Plaintiff's credibility. (Tr. 15.) Second, he contends that ALJ failed to

adequately recognize and consider the *Polaski* factors in assessing his credibility. Finally, Jefferson asserts that the ALJ failed to properly weigh the opinion of treating neurosurgeon Dr. Chitale.

## A.     ALJ Credibility Determination

Jefferson asserts that the ALJ's credibility determination is not supported by substantial evidence, because the ALJ failed to adequately recognize and consider the Polaski factors in assessing his credibility, including his earnings record. The Commissioner contends that the ALJ's consideration of Plaintiff's credibility was consistent with the Commissioner's regulations and policy.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738. "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)). The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

In this action, the ALJ did not mention the *Polaski* case or all of the *Polaski* factors, however, the ALJ cited the proper regulations and social security rulings. (Tr. 15.) (citing 20 C.F.R. § 404.1529 and SSR 96-4p and 96-7p). The ALJ's discussion of Jefferson's credibility focused on observations by treating and examining physicians; the subjective evidence of the duration, frequency, and intensity of Jefferson's pain; and the effectiveness of his medication. (Tr. 15-18.) The ALJ did not mention Jefferson's daily activities or his prior work record.

The ALJ's decision acknowledged that Jefferson alleged severe back pain, used a cane, and had a stimulator permanently placed in his back to relieve the back pain. (Tr. 15.) The ALJ noted that Jefferson testified that his pain had decreased by fifty percent with the stimulator. (Tr. 15.) The ALJ also noted Jefferson's testimony that his pain level remains between 5 and 7 on a

10 point scale; his walking is limited to 2 to 4 minutes before taking a break; and he needs to recline, because he cannot sit up straight. (Tr. 15.) The ALJ held that Jefferson's impairment could reasonably be expected to cause the alleged symptoms, but Jefferson's "statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they were inconsistent with the residual functional capacity assessment." (Tr. 15-16.)

The ALJ relied heavily upon the opinions of Dr. Tariq Javed and Dr. David J. Gower in his credibility assessment. (Tr. 16-17.) The ALJ highlighted Dr. Javed's records, which indicated that Dr. Javed could not find the source of Jefferson's pain on an MRI and he believed Jefferson magnified his symptoms. (Tr. 226.) Dr. Javed recommended that Jefferson pursue conservative treatment and urged him to seek a second opinion. (Tr. 226.) Dr. Gower performed a bone scan, myelogram, and CT scan on Jefferson and also could not find the source of Jefferson's pain. (Tr. 233.) Dr. Gower recommended that Jefferson continue using the pain clinic. (Tr. 233.) The ALJ highlights that Jefferson's MRIs while showing degenerative disc disease, did not show evidence of disc hernia, significant root compression, or significant spinal canal stenosis. (Tr. 16-17.)

The ALJ's opinion implies that because the test results did not indicate the source of Jefferson's reported disabling pain that Jefferson is not credible. "Although the evidence of pain suffered by a claimant may be of necessity subjective in nature, and therefore, difficult to evaluate, the [ALJ] must give serious consideration to such evidence even though it is not fully corroborated by objective examinations and tests performed on the claimant." *Northcutt v. Califano*, 581 F.2d 164, 166 (8th Cir. 1978). "While the claimant has the burden of proving that the disability asserted results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between a physical impairment and

the claimant's subjective pain need not be produced." *Id.* "Whether or not a[n] explanation for the pain can be given, it is nevertheless possible that the claimant is suffering from disabling pain." *Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir. 1984).

The Court believes that the ALJ's credibility assessment regarding Jefferson's subjective pain fails to indicate the consideration of important evidence. The evidence in the record as a whole provides strong support for Jefferson's credibility rather than detracts from it. The administrative record indicates that Jefferson has suffered chronic back pain due to degenerative disc disease for several years. The MRIs and CT scans on his lumbar spine consistently confirm the diagnosis. It is undisputed that Jefferson has a back impairment that requires treatment and as the ALJ noted, his impairment could be reasonably expected to cause the symptoms alleged. Jefferson's treating and examining physicians' treatment notes indicate that Jefferson has consistently sought and used a variety of methods to relieve his back pain. These treatments included a discography, nucleoplasty, epidural steroid injections, physical therapy, pain management, and a variety of prescription medications. Jefferson reported no long term benefits from these treatments; therefore he sought the opinion of three neurosurgeons; Dr. Javed, Dr. Gower, and Dr. Chitale to determine if surgical intervention was an option. The doctors agreed that Jefferson was not an appropriate candidate for surgery, but Dr. Chitale recommended the permanent implantation of the dorsal column stimulator, which eventually provided the most effective relief. (Tr. 226, 233, 344.) The inability to determine the source of Jefferson's pain does not mean the pain does not exist. *See Hight v. Shalala*, 986 F.2d 1242, 1244 (8th Cir. 1993) (fact that x-rays were normal does not mean claimant did not have difficulty breathing, because there is no evidence that normal x-rays were inconsistent with alleged breathing problems).

Next, Dr. Javed's opinion of symptom magnification appears to have been given significant weight. Dr. Javed examined Jefferson once on February 13, 2006 for a neurosurgery consultation. Although Dr. Javed stated that he felt that Jefferson over magnified his symptoms and was "hypersensitive" regarding his lower back pain, Dr. Javed still found that Jefferson suffered from lumbar degeneration disc disease though the source of the lower back pain was unclear. (Tr. 225-226.) "A back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain[.]" *Brand v. Secretary of Dep't Health, Educ. and Welfare*, 623 F.2d 523, 526-27) (8th Cir. 1980). No other doctor has indicated that Jefferson was malingering or magnifying his symptoms.[7] A single comment that the claimant was hypersensitive by a physician who has only treated him once is not sufficient evidence that Jefferson was exaggerating his pain.

The combination of the lack of objective evidence of source of the lower back pain and Dr. Javed's single comment that Jefferson was hypersensitive is not sufficient to detract from Jefferson's credibility when considered in light of the other evidence that provides support for his credibility, including his consistent compliance with treatment over several years. *See O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003) (consistent diagnosis of chronic pain coupled with long history of pain management and drug therapy was an objective medical fact supporting claimant's allegations of disabling pain). The ALJ's decision is further weakened by the fact that there is no evidence that the ALJ considered Jefferson's prior work record. "[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Nunn v. Heckler*, 732 F2d 645, 648 (8th Cir. 1984.) Jefferson's work record shows earnings every year between 1979 and 2006, the onset date of disability. (Tr.

---

[7] Dr. Gower's statement provided that there was no indication in the test results of a source of pain that would result in the pain described by Jefferson. (Tr. 233.) Dr. Gower did not implicitly or explicitly state that Jefferson was malingering.

126.) Jefferson worked as a general laborer. (Tr. 144.) The ALJ mentioned that Jefferson was a laborer, but there is no evidence that he considered Jefferson's strong work history. Again, the ALJ is not required to discuss each Polaski factor, but he must "specifically demonstrate that he considered all of the evidence." *Guillams*, 393 F.3d at 802. There is no evidence that the ALJ considered this important evidence.

Upon careful consideration of the record, the Court cannot say that it "weighs so heavily against [Jefferson's] credibility" that the ALJ would have discounted his credibility absent his erroneous inferences and failure to consider evidence in light of the *Polaski* factors. *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (reversal and remand warranted where ALJ made erroneous inferences regarding claimant's credibility). Accordingly, the Court will remand this action to the Social Security Administration for reconsideration of Jefferson's application.

**B.      Treating Physician Opinion Evidence**

The Plaintiff also asserts that the ALJ erred in his evaluation of Dr. Chitale's opinion. The Commissioner contends that the ALJ properly discounted Dr. Chitale's opinion, because it was inconsistent with the record evidence as a whole and Dr. Chitale's opinion that Jefferson was disabled was an issue reserved for the Commissioner.

In his decision, the ALJ stated as follows:

> As for the opinion evidence, I agree with the DDS residual functional capacity assessment that the claimant is capable of performing light work with some additional limitations. This is supported by objective clinical evidence of the record. I disagree with Dr. Vidyadhar S. Chitale's opinion that the claimant will not be able to return to work in gainful employment secondary to his neurological condition.

(Tr. 17.) The ALJ then stated that Dr. Chitale's opinion was inconsistent with evidence in the record that indicated that Jefferson did not show sensory or motor abnormalities, his pain control was satisfactory and adequate, Jefferson was neurologically stable, and he had done well with a

stimulator. (Tr. 17.) The ALJ also noted that Dr. Chitale's opinion was conclusory and lacked the type of significant clinical and laboratory abnormalities expected, if Jefferson were in fact disabled. (Tr. 17.) Finally, the ALJ mistakenly identified Dr. Chitale as the source of Dr. Javed's report indicating an over magnification of symptoms by Jefferson. Therefore, the ALJ credited the opinion of a non-treating consulting physician over Dr. Chitale.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). "The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than the opinion of a source who is not a specialist." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). "The opinion of a consulting physician who examines the claimant once or not at all does not generally constitute substantial evidence." Id. "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to

which the Commissioner gives controlling weight." *Ellis*, 392 F.3d at 994; *see also* 20 C.F.R.

§ 404.1527(e).

In this case, the Court agrees that the ALJ erred in apparently giving no weight to Dr. Chitale's opinion. Dr. Chitale began successfully treating Jefferson in 2007. Despite Dr. Chitale's treatment of Jefferson for several years and his expertise, the ALJ gave weight to Dr. Collier, the Social Security Administration's consulting physician. Dr. Collier did not examine Jefferson and he also relied heavily on Dr. Javed's notation that Jefferson magnified his symptoms in finding Jefferson only partially credible, which the Court has previously discounted. (Tr. 17, 380-387.) The ALJ also states that it's "not clear" that Dr. Chitale understood the definition of disability and then the ALJ infers that "it is likely that the doctor was referring solely to an inability to perform the claimant's past work, which is consistent with the conclusions reached in this decision." (Tr. 17.) "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). The Court notes that Dr. Chitale's records stated explicitly, "Jefferson is not a candidate for ***any*** job at this point secondary to his chronic disabling pain" and "totally disabled from gainful employment (permanent)." (Tr. 340, 438.) (emphasis added). If the ALJ was unclear about Dr. Chitale's conclusions, he should have contacted Dr. Chitale for additional evidence or clarification and for an assessment of how the impairments limited Jefferson's ability to engage in work related activities or ordered a consultative examination. *See O'Donnell*, 318 F.3d at 818 (if ALJ believed doctor's notes and opinions were of no value despite extensive treatment history, he was obligated to contact the doctor for additional evidence and clarification); *Nevland*, 204 F.3d at 858 (ALJ should have sought opinions from claimant's treating physicians or ordered consultative examinations). Accordingly, the court will reverse and remand the case

for further development and for a re-evaluation of the opinion evidence submitted by Dr. Chitale in this matter.

## VI.    CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's credibility determination of Jefferson and evaluation of Dr. Chitale's opinion evidence was not based on substantial evidence.    Therefore, the Court reverses and remands this action for further proceedings consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Jefferson seeks in his Complaint and Brief in Support of Complaint is **GRANTED**.  [Docs. 1, 16]

**IT IS FURTHER ORDERED** the ALJ's decision of March 18, 2010 is **REVERSED** and **REMANDED**.

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will be filed contemporaneously with this Memorandum and Order remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

Dated this 10th day of October, 2012.


      /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE